IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-

CRISTY GONZALES,

    Plaintiff,

v.

BENNIE VILLANUEVA, a City of Pueblo Police Officer, in his individual capacity, and CHRIS NOELLER, City of Pueblo Chief of Police, in his official capacity,

    Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

COMES NOW, Cristy Gonzales, by and through counsel, for her C.R.S. § 13-21-131(1) and 42 U.S.C. § 1983 action against Defendant City of Pueblo Police Officers Bennie Villanueva ("Villanueva"), and Defendant City of Pueblo Police Chief Chris Noeller ("Noeller") states and alleges as follows:

**INTRODUCTION:**

> 22-2911 - On Monday, February 21, 2022, at approximately 10:50 a.m., near the intersection of Santa Fe Avenue and Mesa Avenue, you deployed your department-issued Taser on a 37- year-old female who was on foot after having been in a stolen vehicle. The body-worn camera footage of the incident shows the female cooperating with your verbal commands when you appeared to Taser her in the back for no apparent reason. Your use of your Taser in this incident was in violation of the following Department policy:
>
> - Subsection 303.5.1 - Application of the TASER Device

1

## PARTIES

1. Plaintiff Cristy Gonzales is and was at all times mentioned a resident of Pueblo, Colorado.

2. Defendant Bennie Villanueva is and was at all times mentioned a resident of Pueblo, Colorado and was at all times relevant an acting police officer with the City of Pueblo Police Department ("PPD").

3. Defendant Chris Noeller is and was at all times mentioned the Chief of Police for the City of Pueblo Police Department in Pueblo, Colorado.

## JURISDICTION AND VENUE

4. This action arises under the Constitution and laws of the United States and is brought through 42 U.S.C. § 1983, and the Constitution of the State of Colorado through C.R.S. § 13-21-131.

5. Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 because, as is shown more fully in this Complaint, Plaintiffs' claims arise under the Constitution and laws of the United States.

6. Jurisdiction over Plaintiff's pendent state law claims is proper under 28 U.S.C. § 1367(a) because they are so related to Plaintiff's claims arising under federal law that they form part of the same case or controversy.

7. Venue is proper in the United States District Court for the District of Colorado pursuant to both 28 U.S.C. § 1391(b)(1) and (2). Specifically, venue is proper under 28 U.S.C. § 1391(b)(1) because all of the events and omissions alleged herein occurred within the State of Colorado. Venue is also proper under 28 U.S.C. § 1391(b)(2) because at the time of the

2

events and omissions giving rise to this litigation, all of the Defendants resided in Colorado, the state in which the District of Colorado is located.

8. Pursuant to 28 U.S.C. § 2201, and F.R.C.P. 57, this court has jurisdiction to enter a Declaratory Judgment in accordance with the relief and issue sought herein.

## FACTS

9. On February 21, 2022 Defendant Villanueva contacted Plaintiff on suspicion that she was driving a stolen Toyota Tacoma truck.

10. Defendant Villanueva and another PPD officer arrived to Plaintiff's location simultaneously, but driving different police vehicles. Defendant Villanueva drove his police car alongside the passenger side of the Toyota Tacoma and the other officer stopped his police car behind the Tacoma.

11. At the point which Villanueva pulled alongside the Toyota Tacoma, it had run out of gas but was still rolling very slowly towards a busy intersection. Plaintiff had exited the driver's seat and was attempting to physically stop the truck from rolling into the intersection by pushing back on the doorframe of the truck.

12. Plaintiff was not strong enough to stop the slow roll of the truck and Villanueva pulled his police car in front of the Tacoma, causing a very low speed collision.

13. At the time Villanueva maneuvered his police car in front of the Tacoma, another PPD officer approached Plaintiff and ordered her to stay put. Plaintiff was standing in the middle of the street complying with the officer's commands, with her hands in the air.

14. Villanueva then exited his car and ran towards the Plaintiff, who was standing in the street complying with the other officer's commands not to move. As Villanueva approached

3

Plaintiff, she was facing him, giving no indications she was about to flee, that she was armed, or making any aggressive movements whatsoever.

15. As Villanueva ran towards Plaintiff, he drew his taser. Before Villanueva contacted Plaintiff, the other officer took control of Plaintiff's right arm:



16. As Villanueva approached Plaintiff, he repeatedly ordered her to "get on the fucking ground," despite her compliance with the gentle control of the other officer who was already hands on with Plaintiff.

4

17. Villanueva then maneuvered behind Plaintiff, grabbed her left arm and wrenched it behind her back, while still pointing his taser at Plaintiff. While Villanueva was still holding her left arm behind her, Plaintiff then began kneeling to the ground in compliance with his demands to "get on the fucking ground."

18. Once Plaintiff was laying nearly horizontal on her stomach, offering no aggression whatsoever and complying completely with Villanueva's commands to "get on the fucking ground," Villanueva deployed his taser at Plaintiff, striking her with both probes in the small of her back, near her spine:



19. Upon being tased, Plaintiff yelled out in pain as the full force of Villanueva's taser discharge coursed through her spine. Plaintiff continues to experience numbness and difficulty using her right hand since being tased in the back by Villanueva.

## **INTERNAL AFFAIRS INVESTIGATION**

20. Upon receipt of the evidence in Plaintiff's subsequent motor vehicle theft case, the Deputy District Attorney prosecuting Plaintiff made a complaint to PPD, asserting her belief that Villanueva had used excessive force against Plaintiff.

21. Alarmingly, in addition to investigating Villanueva for his use of force against Plaintiff, PPD investigated Villanueva for two (2) additional improper uses of force with his taser. These three incidents of excessive force with a taser took place within less than (3) months of each other.

22. As a result of the IA investigation, Villanueva was found to have violated numerous policies to include Conduct, Taser Application, and Professional Workplace Conduct. Ultimately it was concluded that Villanueva used excessive force, by discharging his taser, in two of the reviewed incidents, including the incident involving Plaintiff.

23. Specifically, with respect to Plaintiff, the IA investigation concluded that "The body-worn camera footage of the incident shows the female cooperating with your verbal commands when you appeared to Taser her in the back for no apparent reason." Additionally, PPD concluded that "your misuse of your Taser is very serious," and "Your actions in these cases

are unacceptable and violate not only or policies and procedures, but our values as an organization."

24. However, Villanueva was not terminated and decertified, as required by state law. C.R.S. § 24-31-904 requires that an officer be decertified for a minimum of a year when it is determined in an Internal Affairs investigation that they used excessive force.

25. Notably, during the IA investigation, Villanueva stated numerous times that he, and the rest of the PPD force needed more training on excessive force, and the department issued taser. Villanueva made such statements as:

    a. "I didn't know what that button did [referring to his taser]";

    b. "that is a training issue, um, with me that I haven't been familiarized with this, with this taser";

    c. "I'll be honest, I'm totally unfamiliar with this taser…this to complicated for this taser, needs more, we need more training on it. I need more training.";

    d. "We need more training, we all know that."

26. When Villanueva was asked in the IA what PPD policy was authorizing an officer to use a Taser he gave the following response "We can deploy our taser when, anytime somebody is using, um or we perceive, um, in my perception of it, of escaping, force, um to help resist, get somebody arrested." This obviously does not accurately state PPD policy on Taser usage, 303.5.1:

> - **Subsection 303.5.1 - Application of the TASER Device**
>
> The TASER device may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person:
>
>   a) The subject is violent or is physically resisting.
>   b) The subject has demonstrated, by words or by action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others.
>
> Mere flight from a pursuing officer, without other known circumstances or factors, is not good cause for the use of the TASER device to apprehend an individual.

Nor does his answer comport with state law on when an officer may use force. C.R.S. § 18-1-707.

27. Villanueva also stated in the IA interview, that he had previously been required to conduct a training on use of force with a taser, as discipline for a *prior* incident in which he improperly discharged his taser on someone. However, Villanueva stated that he never finished putting together the training, nor gave the training to his fellow PPD officers, because he was told by a member of the PPD command staff that he didn't actually have to follow through with it.

28. In concluding his IA interview, Villanueva made several statements indicating that his Taser usage in the incidents reviewed by the IA investigation were related to his uncontrollable anger and temper. Alarmingly, Villanueva blames his apparent numerous, previous IA investigations on his drive, that he "pushes hard" and compared himself to others in the department "who have never been in this office because they walk around and do nothing." Villanueva made it clear that he is willing to do what *he* feels is right, even when his actions fall outside of PPD policy and constitutional requirements and/or result in disciplinary action.

8

29. Villanueva's attitude about accountability and respect for policy and constitutional requirements was made abundantly clear is his following statement, given in the IA interview:

> Cpl. Villanueva goes on to say, "Um, the, the, the second one is, um, the training that we have in this department. Um, we get bashed for not being as trained, um, we need more training, we, we all know that, we need more training on. We expect to be this perfect angel now, especially with 217, we, our body cameras, um and then coming back from, I mean, you were a detective, coming back to the street, these people are 100 times worse than what they were when I left the street four years ago. And now our one hand is tied behind our back, um, it's hard to get through to these people, they don't listen. I feel like this department needs to apply more training and work with officers on this language thing. And that's one of the other things I am angry about is that, um."

30. Finally, Villanueva expressed disdain for his fellow officers in connection with yet another apparent IA investigation into his misconduct:

> Cpl. Villanueva continues by saying, "And then the other thing would probably make me angry is just my life in general. I mean the way things are going the last two years, um, with this department, I was falsely charged with people who made up stuff in my interview. It got pushed though, like would be said at the beginning of this meeting. The district attorney has some different feelings about me as an individual. Um, so, my fear is, is I'm going to get singled out. Because it's already laid out on the table, um, and on the news, that somebody has a special interest in me."

31. This IA investigation makes clear that PPD provides its officers with insufficient training, and Villanueva himself admits, particularly in the areas of accountability and use of force requirements.

### **PPD P.O.S.T Rule Violations**

32. Officer Villanueva's opinion on the inadequacy of the training provided to PPD officers was shared by the Peace Officer Standards and Training Board (P.O.S.T.), as just a month after

9

the incident with Plaintiff (March 21, 2022), PPD was sanctioned by the P.O.S.T. Board for non-compliance with P.O.S.T. Rules related to its arrest control training. Specifically, the P.O.S.T. Board determined that PPD training did not meet standards on appropriate use of force. Notably, this non-compliance was identified approximately *two years prior* to the sanctions, however PPD had not changed its training.

33. Finally, PPD has not been truthful with the P.O.S.T. Board regarding the certifiability of its officers. On January 31, 2023, PPD sent its annual certification to P.O.S.T. Board, declaring that none of its officers had any "disqualifying incidents" from the previous year. P.O.S.T. Rule 1 defines "disqualifying incidents" to include "An administrative law judge, hearing officer, or internal investigation finds that a peace officer used unlawful physical force, failed to intervene, or violated section 18-1-707, C.R.S. as described in §24-31904, C.R.S." P.O.S.T Rule 1(o)(VI). Thus, PPD falsely declared to the P.O.S.T. Board that Villanueva was eligible to maintain his peace officer certification, despite their very own IA investigation conclusions *in this case*.

34. To date, the P.O.S.T. Board maintained searchable database shows that Villanueva continues to be a certified peace officer, is still employed at PPD, and that no P.O.S.T. disciplinary action has ever been instituted against him, despite PPD's own clear finding that he used excessive force against Plaintiff here. This failure of PPD to report this disqualifying incident is an intentional dereliction of mandatory reporting requirements imposed on all departments who employ P.O.S.T. certified peace officers, as imposed by state law. C.R.S. §§ 24-31-903, 24-31-904.

**FIRST CLAIM FOR RELIEF**

10

### Civil Action for Deprivation of Rights, Pursuant to C.R.S. §13-21-131

### Article II Section 7 of the Colorado Constitution– Excessive Force

(against Defendant Villanueva)

35. Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

36. When Defendant Villanueva tased Plaintiff in the back as she knelt to the ground in compliance with his commands, and did so for "no apparent reason," he assaulted Plaintiff, employing excessive and unlawful force, in violation of Article II Section 7 of the Colorado Constitution.

37. No officer would consider Defendant's deployment of painful force and excessive aggression upon Plaintiff to have been reasonable or justified under the circumstances. Additionally, Defendant's action was in blatant disregard for his own agency's policies.

38. Defendant's physical assault on Plaintiff was unnecessary and unreasonable. Article II Section 7 of the Colorado Constitution forbids unreasonable seizures, which includes seizures carried out with excessive force, like this one. Defendant Villanueva effected this assault and injuries to Plaintiff with deliberate indifference to her rights.

39. Defendants' unjustified and violent seizure and assault upon Plaintiff caused her to experience great physical pain, injury, terror and exposed her to great risk of death. This experience continues to cause Plaintiff trauma and emotional distress, along with lasting physical injuries.

40. Plaintiff further seeks injunctive relief against Defendants Villanueva, prohibiting him from maintaining P.O.S.T. certification. C.R.S. § 13-21-131(1) authorizes this court, upon a

11

finding of Defendant's liability, to order "legal or equitable or any other appropriate relief." Plaintiff believes this injunctive relief, in the form of revoking Defendants' P.O.S.T. certification, would be particularly appropriate in this action, not only as a sanction for unlawful behavior, but also in an effort to protect the community from similar injury.

## SECOND CLAIM FOR RELIEF

### Fourth Amendment to the U.S. Constitution through 42 U.S.C. § 1983 –

### Municipal Policy- Failure to Train and Discipline

(Defendant Noeller in his official capacity)

41. Plaintiff hereby incorporates all other paragraphs of the Complaint as if fully set forth herein.

<u>Failure to Discipline</u>

42. In order to establish [a Monell claim for failure to discipline], [a p]laintiff must allege that the Departments had in place (1) a custom or policy of failure to discipline; (2) deliberate indifference on the part of the decision maker, and (3) a causal link to the constitutional deprivation. *Estate of Holmes by and through Couser v. Somers*, 387 F. Supp. 1233, 1263 (D. Kan. 2019). "Evidence of prior complaints can be sufficient to show that a municipal Defendant and the officials ignored the officers' misconduct." *Id*.

43. In the IA investigation into this case, Defendant Villanueva was found to have used excessive force by means of his taser against Plaintiff, as well as another person in a separate incident. Additionally, the IA investigation revealed that Defendant Villanueva had been subject to multiple previous IA investigations, including at least one prior misuse of his taser. However, PPD did not actually discipline Villanueva, just as they failed to terminate and decertify him for tasing Plaintiff here, a mandatory form of discipline required by state law.

PPD then falsified their annual certification to the P.O.S.T. Board that no officer had been the subject of a disqualifying incident, despite at least three disqualifying incidents against Villanueva.

44. Defendant PPD's failure to discipline Villanueva for prior instances of excessive force by means of a taser, just as here, displayed a deliberate indifference on behalf of PPD in taking excessive force situations seriously, and disregarded the risks to citizens at the hands of an officer who has displayed a clear pattern of excessive force.  By falsifying their annual certification to the P.O.S.T. Board, PPD went a step beyond deliberate indifference and in fact took intentional action to cover-up their own officer's unconstitutional misconduct.

45. As noted above, this is not the first time that PPD has displayed deliberate indifference to the constitutional rights of citizens its officers encounter, specifically in the excessive force context.  Prior to being sanctioned by the P.O.S.T. Board for the unlawful use of force training employed it its academy in 2022, PPD had been notified of its deficiency over two (2) years prior, yet did not correct its curriculum.

46. Defendant PPD's failure to discipline Villanueva for prior, similar incidents, led to the unconstitutional attack against Plaintiff here, and caused her to experience great physical pain, injury, terror and exposed her to great risk of death.  This experience continues to cause Plaintiff trauma and emotional distress, along with lasting physical injuries.

Failure to Train

47. Additionally, "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388

(1989); *see also Cullen v. Phillips*, 30 P.3d 828, 830–31 (Colo. App. 2001) ("Where a municipality completely fails to train its police force or trains its officers in a reckless or grossly negligent manner such that police misconduct is almost inevitable, liability may attach under § 1983."). To prevail on a failure to train claim against a municipality, a plaintiff must demonstrate that the training was inadequate and that "(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of city the with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).  The United States Supreme Court has indicated that a pattern of similar constitutional violations by untrained employees may be demonstrative of deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

48. Here, Defendant Villanueva repeatedly stated during the IA investigation that he needed more training, specifically on the use of his taser.  Additionally, Defendant Villanueva repeatedly stated that the members of the department agreed that they all needed more training on tasers, use of force, and constitutional requirements as contemplated in "217", (referring to Colorado SB20-217, the legislative bill that created the cause of action under C.R.S. §13-21-131).

49. Further, Villanueva made clear that one of multiple prior IA investigations into his improper use of a taser had resulted in him being required to create and lead a training on use of force,

14

specifically with tasers, however command staff later told him that he did not need to complete either. This lack of training in regards to use of force, specifically by means of a taser, became all too apparent when Villanueva was then found to have improperly used his taser again, here against Plaintiff and two other individuals in incidents he was simultaneously investigated for. Upon information and belief, this prior IA investigation of Villanueva's use of excessive force by means of a taser, should have been a disqualifying incident, in and of itself, yet PPD failed to take the proper action to do so, as required by state law.

50. Taken together with PPD's sanctions for teaching improper use of force techniques in their training academy, of which they had been on notice of by the P.O.S.T. Board two years prior, yet PPD did not bother correcting- it is painfully clear, particularly to Plaintiff, that PPD was deliberately indifferent to the rights of persons PPD personnel regularly come into contact with, resulting in the unjustifiable use excessive force.

51. Plaintiff further seeks injunctive and declaratory relief against PPD, requiring PPD to correct its annual certification to the P.O.S.T. Board, and praying this Court to enter a Declaratory Judgment against PPD, declaring that they provided false info to the P.O.S.T Board about the certifiability of Defendant Villanueva, in violation of C.R.S. §24-31-903. Plaintiff believes this injunctive and declaratory relief, would be particularly appropriate in this action, not only as a sanction for unlawful behavior, but also in an effort to protect the community from similar injury.

**WHEREFORE**, Plaintiff prays judgment against Defendants for such sum that will fairly and adequately compensate Plaintiff for her damages and for such other and further relief as the Court deems just and proper under the circumstances, and for her costs incurred and expended.

Plaintiff requests a jury trial.

/s/ Kevin Mehr
 **KEVIN MEHR, #49108**
 Mehr Law PLLC
 3107 W. Colorado Ave. #184
 Colorado Springs, CO 80904
 719-315-4606
 Kevin.mehr@mehrlawcolorado.com

 Dated:  November 15, 2023

16